*Proposed Order Prepared and Submitted By:*
James K. Tracy (#6668)
Adelaide Maudsley (#8791)
CHAPMAN AND CUTLER LLP
1000 Kearns Building
136 South Main Street
Salt Lake City, Utah 84101
Telephone: (801) 320-6700
Facsimile: (801) 359-8256

Attorneys for Plaintiff Randall Danjanovich

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| RANDALL DANJANOVICH<br><br>　　　　Plaintiff,<br><br>v.<br><br>THOMAS ROBBINS, RICHARD BYBEE, CLAIR COX, ROGER COX, DOUGLAS L. LITSTER, QUADE NELSON, RANDY HAMEL, SCOTT ALDER, TEK FOUNDATION, a Utah Corporation, and TEK CORPORATION, a Utah Corporation.<br><br>　　　　Defendants. | **PLAINTIFF RANDALL DANJANOVICH'S [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW**<br><br><br><br>Case No. 2:04CV00623 TS<br><br>Judge Ted Stewart<br><br>Magistrate Judge David Nuffer |

The Court conducted a bench trial in this action on May 23-25, 2006. James K. Tracy and Adelaide Maudsley appeared as counsel for the Plaintiff, Randall Danjanovich. Mr. Danjanovich was also present at the trial. Delano Findlay appeared as counsel for the Defendants Douglas

Litster, Clair Cox ("C. Cox"), and Roger Cox ("R. Cox"). The Defendants Litster, C. Cox, and R. Cox were also present at the trial. Pursuant to Local Rule 54-1, the Plaintiff, through his undersigned counsel, submits the following proposed findings of fact and conclusions of law.

## FINDINGS OF FACT

### The Plaintiff

1.      The Plaintiff Randall Danjanovich ("Danjanovich") is a high-school educated landscape contractor.[1] Danjanovich has limited investment experience, having previously invested small amounts of money through a stockbroker. He is not a sophisticated investor.[2]

### The Defendants

2.      TEK Corporation ("TEK Corporation") is a Utah corporation headquartered in Salt Lake City, Utah that claimed to be in the business of locating and providing funding for the advancement of educational opportunities throughout the world.[3] On Danjanovich's motion for civil contempt and request for sanctions for failure to respond to discovery requests, default judgment was entered against TEK Corporation in this action on May 16, 2006 (Docket Nos. 223, 224).

3.      TEK Corporation's securities are not registered with the Securities and Exchange Commission ("SEC"), nor are they listed on any exchange or quoted through any quotation medium.[4]

---

[1] Trial Tr. at 22:14, 24-25.

[2] Trial Tr. at 23:6; 24:1-5; 117:20-24.

[3] Pretrial Order, Stipulated Fact Nos. 1, 4.

[4] Pretrial Order, Stipulated Fact No. 2.

4.      TEK Corporation and TEK Foundation never filed a registration statement with the SEC in connection with their investment programs.[5]

5.      TEK Foundation ("TEK Foundation" and together with TEK Corporation, sometimes collectively referred to as "TEK") is a Utah organization.[6]  On Danjanovich's motion for civil contempt and request for sanctions for failure to respond to discovery requests, default judgment was entered against TEK Foundation in this action on May 16, 2006 (Docket Nos. 223, 224).

6.      Richard Bybee ("Bybee") is an officer of TEK Corporation and was primarily responsible for developing TEK's website.[7]  Default judgment was entered against Bybee in this action on August 8, 2005 (Docket No. 75).  Bybee appeared as a witness for the Defendants Litster, C. Cox, and R. Cox at trial.  Danjanovich moved to strike Bybee's trial testimony regarding the TEK website on grounds that documents and information about which he testified were not produced in discovery.  The Court took Danjanovich's motion to strike under advisement.

7.      Randy Hamel ("Hamel") is Vice President of Investment and Property Management of TEK Foundation.  Hamel was voluntarily dismissed as a Defendant in this action on May 16, 2006 after he filed bankruptcy (Docket No. 228).

---

[5] Pretrial Order, Stipulated Fact No. 24.

[6] Pretrial Order, Stipulated Fact No. 3.

[7] Pretrial Order, Stipulated Fact No. 10; Trial Tr. at 317: 2-5.

8.    Quade Nelson ("Nelson") is a Vice President of TEK Foundation.  Default judgment was entered against Nelson in this action on September 21, 2005 (Docket No. 95).   Nelson subsequently filed bankruptcy and received a discharge.

9.    Thomas Robbins ("Robbins") is the Chief Executive Officer of TEK Foundation and an officer of TEK Corporation.[8]   Judgment was entered against Robbins in this action on October 17, 2005 (Docket No. 109).

10.    Scott Alder ("Alder") raised money for investment into TEK.[9]  He and Clair W. Cox and Douglas L. Litster were also business partners in other non-TEK ventures.[10]  Default judgment was entered against Alder in this action on October 1, 2005 (Docket No. 100).  On May 15, 2006, the Court entered an order granting Danjanovich's motion to exclude Alder from testifying at trial based on his repeated failure to appear for his noticed depositions (Docket No. 219).

11.    Clair W. Cox ("C. Cox") is the Chief Financial Officer/Secretary/Treasurer of TEK Foundation and an officer of TEK Corporation.[11]   C. Cox had check-signing authority for TEK

---

[8] Pretrial Order, Stipulated Fact No. 5.

[9] Trial Tr. at 54:6 - 55:20; 109:13-25; 110:1-25.

[10] Trial Tr. at 250:8-20.

[11] Pretrial Order, Stipulated Fact No. 6.

Corporation, along with Robbins.[12]  C. Cox possessed, directly or indirectly, the power to direct or cause the direction of the management and policies of TEK Foundation and TEK Corporation.[13]

12.     C. Cox invoked the Fifth Amendment throughout his deposition in responding to questions about almost all aspects of the TEK investment program and its investors and any associations between Alder and TEK.[14]  Before trial, Danjanovich filed a motion to preclude C. Cox from testifying at trial on those matters for which he invoked the Fifth Amendment during his deposition and to draw an adverse inference against C. Cox as to these same matters.   On May 15, 2006, the Court granted Danjanovich's motion in part (Docket No. 219), precluding C. Cox from testifying at trial concerning matters for which he invoked the Fifth Amendment during discovery and leaving for determination at trial whether the Court would impose an adverse inference against C. Cox as to these same matters.

13.     Roger Cox ("R. Cox") is the President of TEK Foundation.[15]  R. Cox possessed, directly or indirectly, the power to direct or cause the direction of the management and policies of TEK Foundation and TEK Corporation.[16]

---

[12] Trial Tr. at 401:3-7

[13] Memorandum Decision Granting in Parting Plaintiff's Motion in Limine Regarding Admitted Matters May 22, 2006 at 4 (Docket No. 211).

[14] Trial Tr. at 237:17-25; 238; 239; 240; 241; 242:1-5; 251:13-19; 258:7-10.

[15] Pretrial Order, Stipulated Fact No. 7.

[16] Memorandum Decision Granting in Parting Plaintiff's Motion in Limine Regarding Admitted Matters May 22, 2006 at 4 (Docket No. 211).

14.     Douglas L. Litster ("Litster") is a Director of TEK Foundation and, as of February 2002, a director of TEK Corporation.[17]  Litster participated in explaining TEK's investment program to investors and potential investors.[18]  Litster possessed, directly or indirectly, the power to direct or cause the direction of the management and policies of TEK Foundation and TEK Corporation.[19]

15.     TEK Corporation, TEK Foundation, and their respective principals, including C. Cox and Litster, are not, nor have they ever been, licensed broker-dealers in the state of Utah.[20]

16.     The SEC brought an action captioned *Securities and Exchange Commission v. TEK Corporation, et al.*, Case No. 2:05cv107 (the "SEC Action") against TEK Corporation, Litster, C. Cox, Robbins, and Bybee alleging securities fraud.[21]  C. Cox and Litster have each been ordered in the SEC Action to disgorge the profits they earned from the TEK investment program, plus prejudgment interest, and to pay civil penalties of $100,000.[22]

---

[17] Pretrial Order, Stipulated Fact No. 8; Trial Tr. at 414:5-6.

[18] Trial Tr. at 281:14-18.

[19] Memorandum Decision Granting in Parting Plaintiff's Motion in Limine Regarding Admitted Matters May 22, 2006 at 4 (Docket No. 211).

[20] Pretrial Order, Stipulated Fact No. 18.

[21] Pretrial Order, Stipulated Fact No. 19.

[22] Pretrial Order, Stipulated Facts Nos. 20-24.

**The TEK Investment Program**

17.     TEK Corporation claimed to use TEK Foundation as a vehicle for the advancement of educational opportunities throughout the world.[23]

18.     In its efforts to raise funds for TEK Foundation and its charitable purposes, TEK Corporation established one or more investment programs (the "TEK Investment Program").  The TEK Investment Program involved the sale of securities to a number of investors.[24]

19.     These securities were not registered.[25]

20.     TEK established a day-trading investment program that defendants admit promised at least a 20-25% monthly return to its investors (i.e. 240-300% per annum).[26]

21.     Litster was familiar with and knew of those who invested in such program.[27]

22.     TEK also established another investment program that Litster referred to as the underwriting program.  Litster told investors they could achieve 100% return on their investments

---

[23] Pretrial Order, Stipulated Fact No. 4.

[24] Defendants' Trial Memorandum at 1 ("The defendants acknowledge that they have been involved in a program commonly referred to as a TEK Investment program which involved the sale of investments through TEK Corp to a number of individual investors by direct contact.").

[25] Pretrial Order, Stipulated Fact No. 2.

[26] Trial Tr. at 435:5-21.

[27] Trial Tr. at 419:6-16; 420:1-25.

through this program.  Indeed, at least one contract between TEK and an investor specified as much.[28]

23.     Litster maintained a list of investors for the TEK Investment Program at his home. Although requested to do so in this action, he did not produce a copy of that list.[29]

24.     Litster was in touch with Robbins at least two to three times per week while the TEK Investment Program was ongoing.[30]  Litster received directives and instruction from Robbins about the TEK Investment Program, including the directive to prepare email correspondence and forward other email correspondence from Robbins to TEK investors updating them about the program and its progress.[31]  Mr. Litster carried out the directives he received from Mr. Robbins with regard to the TEK Investment programs.[32]

25.     TEK Foundation established a website to provide investors and others information about its management, its mission, and its charitable purposes.  Investors were encouraged to visit the website.[33]

---

[28] Trial Tr. at 435:5-15.

[29] Trial Tr. at 301:7-11.

[30] Trial Tr. at 290:9-22.

[31] Trial Tr. at 291:14-25.

[32] Trial Tr. at 290-292.

[33] Trial Exhibit 16, TEK 000000212RD.

26.     The TEK website was comprised of various sections, including "leadership" which showed pictures and biographies of TEK management, including Litster and C. Cox.

27.     In the "assets" section of its website, TEK disclosed that it held interests in various properties in the Western United States and Mexico.[34]  TEK did not own this property per se but through joint venture arrangements, possessed a "beneficial interest" and was able to "hypothecate" the property.[35]  Neither Litster nor C. Cox understood or could explain what exactly TEK could do with these "hypothecation" rights or what such rights meant for TEK and/or its investors.  TEK did not disclose these property interests in its balance sheets for 2001, 2002, or 2003.[36]  One of the joint venture agreements between TEK and Universal Rockwell reflected $18 billion worth of property consisting of much of Riverside, California, to which TEK claimed rights to ownership through an old Spanish land grant.[37]

28.     Scott Alder ("Alder") raised money for investment into TEK.[38]  Alder appears as an "investor" in TEK's balance sheets.[39]  Alder was also involved in the day-trading investment program.[40]

_____

[34] Trial Tr. at 295:11-25; 296:1-19; 298:4-5.

[35] Trial Tr. at 296:18-25.

[36] Trial Tr. at 299:10-25; 300:1-2.

[37] Trial Tr. at 396:6-25.

[38] Trial Tr. at 54:6 - 55:20; 109:13-25; 110:1-25.

[39] Trial Tr. at 285:24-25.

29.     In 2002, Alder placed $503,000 in TEK.[41]

30.     Between early 2002 through the end of 2003, Alder received $158,000-$160,000, maybe more, from I-Trust and TEK Corporation.[42]  Disbursements to Alder were usually made directly from the I-Trust account.

31.     Alder solicited investors to participate in the TEK Investment Program.[43]

32.     Litster knew Alder had specific amounts coming in from various sources on certain dates and times in the day-trading investment program, because Litster received email correspondence from Alder indicating as much.[44]  These "investments" were in the form of direct deposits to the I-Trust account.[45]

33.     C. Cox received at least $83,140 in profit as a result of his involvement with the TEK Investment Program.[46]

---

[40] Trial Tr. at 422:19-21.

[41] Trial Tr. at 245:18-25; 246:1-6.

[42] Trial Tr. at 445:16-25.

[43] Trial Tr. 444:1-18.

[44] Trial Tr. at 444:9-12.

[45] Trial Tr. at 444:13-20.

[46] Pretrial Order, Stipulated Fact No. 20.

34.     Litster received at least $84,723 in profit as a result of his involvement with the TEK Investment Program.[47] The TEK balance sheets reflecting the check numbers, dates, and amounts label such amounts as "commissions."[48]

35.     TEK received from investors and, in turn, invested approximately $4.2 million in Europe.[49]

36.     TEK has, to date, returned or disbursed to investors only about $1.8 million.[50]

37.     TEK and its principals, including Litster and C. Cox, continue to maintain that TEK is going to be able to pay back all of its investors.[51]

### I-Trust

38.     The I-Trust was a bank account at Wells Fargo (account # 0343377966) into which money from TEK investors was deposited.[52]

39.     TEK Corporation and I-Trust are affiliated.[53]

40.     TEK Corporation made various deposits to the I-Trust account.[54]

---

[47] Pretrial Order, Stipulated Fact No. 21.

[48] Trial Tr. at 283:5-11.

[49] Trial Tr. at 442:2-3.

[50] Trial Tr. at 441-21-25; 442:1-5.

[51] Trial Tr. at 441:17-20.

[52] Pretrial Order, Stipulated Fact No. 9.

[53] Trial Exhibit 49 (Affidavit of C. Cox in the Zarbock case); Trial Tr. at 253:1-8.

41.    I-Trust made various payments to TEK Corporation, including at least one for $125,000 and other amounts for rent and other expenses.[55]

42.    C. Cox invoked the Fifth Amendment as to whether I-Trust ever made deposits into TEK Corporation accounts or vice versa.[56]

43.    Monies that I-Trust received from investments were sent to TEK with instructions as to which investors such monies were to be disbursed.  Alternatively, monies TEK received from investments or otherwise were deposited in to I-Trust.[57]

44.    Litster received monies from I-Trust and TEK Corporation.[58]

45.    C. Cox received monies from I-Trust and TEK Corporation.[59]

46.    Alder received monies from I-Trust and TEK Corporation.[60]

**Relationship Between Alder and TEK, Alder and Litster, and Alder and C. Cox**

47.    Alder solicited investors to participate in the TEK Investment Program.[61]

---

[54] Trial Tr. at 108:8-25.

[55] Trial Tr. at 108:8-25.

[56] Trial Tr. at 255:23-25; 256:1-21.

[57] Trial Tr. at 285:3-11.

[58] Pretrial Order, Stipulated Fact No. 13.

[59] Pretrial Order, Stipulated Fact No. 14.

[60] Pretrial Order, Stipulated Fact No. 15.

[61] Trial Tr. 443-444.

48.     Litster and Alder corresponded by email periodically.  In February 2002, Alder sent Litster an email message in which Alder enumerated amounts, times, and dates of investments.[62] This email correspondence related to TEK investors and was a method by which Alder was informing Litster that monies Alder had raised were deposited in to I-Trust.[63]

49.     Litster and Alder had engaged in prior investment activities together, dating back to about 1999.[64]

50.     Alder, C. Cox, and Litster were business partners in other ventures.[65]

**The Danjanovich Investment in TEK**

51.     Danjanovich met Alder in the summer of 2000 when Danjanovich agreed to construct a three-hole golf course for Alder at his St. George home.[66]

52.     Alder mentioned to Danjanovich that Alder was involved in various investment programs, including one with Litster.[67]

53.     Danjanovich first became acquainted with TEK Corporation through Alder.[68]

---

[62] Trial Tr. at 109:13-25; 110:1-25

[63] Trial Tr. at 287:23-25; 288:1-7

[64] Trial Tr. at 281:8-13.

[65] Trial Tr. at 250:8-20; Trial Tr. at 281:5-7; Trial Tr. at 223:4-12.

[66] Trial Tr. at 24:10-18.

[67] Trial Tr. at 24:22-25; 25:1-4.

[68] Trial Tr. at 24:6-9.

54.    References to TEK Corporation and TEK Foundation were often made interchangeably. Alder did not differentiate between TEK Corporation and TEK Foundation but simply referred generically to TEK.[69] Danjanovich did not know there was any difference between TEK Corporation and TEK Foundation.[70]

55.    On July 11, 2001, Alder introduced Danjanovich to Litster and C. Cox in the parking lot of the Thanksgiving Point Golf Course where they met and then traveled to and toured the Saratoga Springs Golf Course (the "Golf Course Meeting").[71] Kent Danjanovich, Danjanovich's uncle, and Ted Johnson, a realtor from St. George, were also present at the Golf Course Meeting.[72]

56.    Kent Danjanovich was looking for an investor to put up about $3 million to complete the construction of the Saratoga Springs Golf Course.[73]

57.    Alder indicated to Danjanovich that Litster and C. Cox would have access to that kind of money—indeed, Alder represented that $3 million would be a drop in the bucket compared to the amounts Litster and C. Cox were going to make from the investment programs in which they were involved.[74]

---

[69] Trial Tr. at 32:24-25; 33:1-2.

[70] Trial Tr. at 32:21-25.

[71] Trial Tr. at 25:8-17; 27:16-17; 183:19-22; 348:13-21.

[72] Trial Tr. at 25:15-17.

[73] Trial Tr. at 26:1-9.

[74] Trial Tr. at 26:10-13; 27:3-6; 189:13-18.

58.     At the Golf Course Meeting, Litster and C. Cox mentioned an investment program to Danjanovich and said that they anticipated receiving large amounts of earnings from that program to fund an investment in the Saratoga Springs Golf Course. In fact, Litster and C. Cox represented that the upcoming investment program would generate enough returns to allow them to invest $50 million in the Saratoga development.[75]

59.     At the Golf Course Meeting, Alder, Litster and C. Cox told Danjanovich that Litster was a director of TEK Corporation and that C. Cox was a chief financial officer of TEK Corporation.[76] C. Cox also gave his TEK Corporation business card to Kent Danjanovich.[77]

60.     At the Golf Course Meeting, Litster represented to Danjanovich that Litster was a high-ranking leader in a local religious organization to which Danjanovich belonged.[78]

61.     At the Golf Course Meeting, Litster and C. Cox told Danjanovich that Litster and C. Cox would make enough money from the TEK Investment Program that they could personally invest the money to purchase the Saratoga Springs Golf Course and the related housing development.[79]

---

[75] Trial Tr. at 28:20-25; 29:19.

[76] Trial Tr. at 28:10-17.

[77] Trial Tr. at 28:5-6.

[78] Trial Tr. at 50:16-17.

[79] Trial Tr. at 30:23-25; 31:1-3, 9.

62.    After the Golf Course Meeting, between about July 2001 and January 2002, Danjanovich met with Litster and C. Cox on three occasions, including (i) a meeting at the offices of TEK Corporation located at 7050 South Fort Union Boulevard, Suite 350, in Salt Lake City, Utah, in late July or early August 2001, (ii) another meeting at the offices of TEK Corporation, and (iii) a brief meeting passing in an elevator at the offices of TEK Corporation.[80]

63.    Alder was present at one or more of these meetings.[81]

64.    During these meetings, Litster and C. Cox expressed their continued interest in the golf course investment but because of the status of their investment program, were not prepared to invest in a golf course project at that time.[82]

65.    However, both Litster and C. Cox represented to Danjanovich that the Investment Program and resulting funds from that program would be forthcoming.[83]

66.    Kent Danjanovich also met with Litster and C. Cox, and at one such meeting, Kent Danjanovich was told that he and Randy Danjanovich could make more money than they could ever imagine through the TEK Investment Program.[84]   He believes it was Litster who made the statement

---

[80] Trial Tr. at 11-25; 32:1-10.

[81] Trial Tr. at 196:11-13.

[82] Trial Tr. at 32:13-15.

[83] Trial Tr. at 32:16-18.

[84] Trial Tr. at 200:16-25; 201:1-4; 225:13-25; 226:1-7.

but is not sure; both Litster, C. Cox and Alder were present at the meeting at which the statement was made.[85]

67.     Alder told Danjanovich and Kent Danjanovich about TEK's website on many occasions and specifically directed them to visit that website.[86]

68.     Litster and C. Cox told Danjanovich about TEK's website and directed Danjanovich to visit the website as well, although Danjanovich does not recall exactly when Litster and C. Cox did so.[87]  They made similar statements to Kent Danjanovich in 2001.[88]

69.     Danjanovich visited TEK's website several times and reviewed information and material on that website about TEK, its mission, and its management (or its "leadership" as it was termed on the website).[89]

70.     Before he invested in TEK, Danjanovich reviewed a website biography of Robbins. Danjanovich subsequently learned when he was asked to testify before the SEC in the SEC Action that Robbins had felony convictions that were not disclosed in his biography.  Danjanovich would not have invested in TEK if he had known about Robbins' felony convictions.[90]

---

[85] Trial Tr. at 225:13-21.

[86] Trial Tr. at 37:1-8; 201:21-25.

[87] Trial Tr. at 38:13-15.

[88] Trial Tr. at 201:21-25; 202:1-8; 212: 4-10.

[89] Trial Tr. at 36:23-25; 42:6-25.

[90] Trial Tr. at 47:19-25; 48:1-8.

71.    Before he invested in TEK, Danjanovich reviewed a website biography of C. Cox and was impressed by his credentials.[91]

72.    Before he invested in TEK, Danjanovich also reviewed a website biography of Litster and was impressed by his credentials.[92]

73.    Before he invested in TEK, Danjanovich also reviewed a TEK website page identifying TEK's assets, including property holdings totaling 3.2 million acres available for industrial, commercial, and residential development, and various entities in which TEK was a major shareholder.[93] Danjanovich was impressed by TEK's extensive assets and relied on the information provided on the TEK website about those assets in deciding to participate in the TEK Investment Program.[94]

74.    Kent Danjanovich also visited TEK's website and reviewed similar information, including biographies for each of Robbins, Litster, and C. Cox, and TEK's property holdings.[95]

75.    In January 2002, at a meeting at his home in St. George, Utah, Alder invited Danjanovich to invest in TEK.[96]

---

[91] Trial Tr. at 48:9-25; 49:1-18.

[92] Trial Tr. at 49:19-25; 50:1-17.

[93] Trial Tr. at 51:11-25; 52:1-25; 53:1-5.

[94] Trial Tr. at 53:6-11.

[95] Trial Tr. at 202:9-25; 203:1-15.

[96] Trial Tr. at 54:6-25.

18

76.     Alder told Danjanovich that he should pool money from his friends and family and invest it in the TEK Investment Program but that Danjanovich would need to act quickly, as there was a limited window of time within which TEK could place an investment.[97]

77.     The investment, Alder told Danjanovich, would be a "stock transaction," would be "risk free," would return 100 percent interest per month and would be returned on request at any time within fifteen business days.[98]

78.     TEK, according to Alder, had proprietary information from the United States government that would help TEK make beneficial and lucrative investments to further its educational endeavors.[99]

79.     Alder told Danjanovich that there were two ways in which Danjanovich could invest his money with TEK, either through Alder or through deposits directly to I-Trust.[100]

80.     Alder gave Danjanovich specific account information for the I-Trust account to facilitate deposits into that account.  Danjanovich made inquiry with the bank to confirm that this account actually existed and that the account information he was given was for the I-Trust account.[101]

---

[97] Trial Tr. at 55:2-13.

[98] Trial Tr. at 55:14-20; 56:14-20.

[99] Trial Tr. at 55:14-20.

[100] Trial Tr. at 56:24-25; 57:1-9.

[101] Trial Tr. at 59:21-25; 60:1-2.

81.     Danjanovich invested a total of $197,000 in the TEK Investment Program between January 2002 and the first part of May 2002.[102]

82.     Danjanovich invested $90,000 in TEK initially, for which he received a promissory note from Alder.[103]

83.     The promissory note dated February 26, 2002 that Danjanovich received guarantees repayment of $90,000 with interest at the rate of 100% per month.  Danjanovich understood the note to be a form of guaranty—that Alder would repay the amount if TEK failed to do so.[104] Danjanovich understood that the form of note Alder used was from TEK, although there were some differences between the note Danjanovich ultimately signed and other notes that TEK had issued.[105]

84.     Danjanovich did not receive a note from Alder for the additional amounts Danjanovich invested in TEK, but receipt of the promissory note for the initial amount contributed to Danjanovich's willingness to invest additional amounts.[106]

85.     Defendants did not dispute at trial that the $197,000 was actually invested in TEK and in fact, admitted this fact in prior pleadings.[107]

---

[102] Trial Tr. at 23:15-24.

[103] Trial Tr. at 100:1-25.

[104] Trial Tr. at 100:5-13.

[105] Trial Tr. at 100:20-25; 101:1-2; 146:19-25; 147:1-21.

[106] Trial Tr. at 101:3-5; 152:12-15.

[107] Trial Exhibit 42 (TEK Corp. admitted in its Statement of Undisputed Facts that the money was invested in TEK).

86.     Of the $197,000 total he invested in TEK, Danjanovich deposited $55,500 directly into I-Trust.[108]  This amount was comprised of smaller amounts from Danjanovich's friends and family, including in-laws, several friends, and an uncle, that were deposited on January 25, 2002, February 7, 2002, and February 15, 2002.[109]

87.     At the end of January 2002, Danjanovich began receiving daily trading statements.[110]

88.     The daily trading statements showed that Danjanovich was earning incredible returns, exceeding 100% per month.[111]

89.     At the end of January 2002, Danjanovich also began receiving daily email updates associated with the money he placed in the TEK Investment Program.[112]

90.     The face of the emails themselves indicates that the emails were either (1) written by Litster for delivery to investors or (2) were written by Robbins and forwarded by Litster to investors.[113]

---

[108] Trial Tr. at 57:12-15; 451:16-25.

[109] Trial Tr. at 62:10-25; 63:1-25; 64:1-25; 65:1-6.

[110] Trial Tr. at 71:18-72:9; Trial Exhibit 15.

[111] Trial Exhibit 15.

[112] Trial Tr. at 80:12-17.

[113] Trial Exhibit 16.

91.    Many of the daily email updates that Danjanovich received are addressed to "team@tekfoundation.org," which Danjanovich understood to be all of the people, including him, who participated in the TEK Investment Program.[114]

92.    Some of the email updates that Danjanovich received are from "team@tekfoundation.org" and addressed to "team@tekfoundation.org"; a few are from Alder; others are from "doug@tekcorp.org," which was Doug Litster, and addressed to "team@tekfoundation.org"; and still others appear as forwarded emails from Robert L. Norton, a man with whom Litster was living.[115]

93.    Litster acknowledges that he sent all of the email updates to TEK's investors.[116]

94.    The email updates provided updates about the status and progress of the TEK Investment Program and indicated that the investment program was progressing and that returns to investors would be available very soon, sometimes within days or within the next several weeks.[117]

95.    Some of the email updates also direct recipients to the TEK website.[118]

---

[114] Trial Tr. at 84:24-25; 85:1-2.

[115] Trial Exhibit 16; Trial Tr. at 86:4-6; 109:15-17.

[116] Trial Tr. at 304:13-18; Trial Exhibit 16.

[117] Trial Tr. at 87:24-25; 88:1-3; Trial Tr. at 305:11-15.

[118] Trial Tr. at 305:4-5; Trial Exhibit 16 00000211RD.

96.     Danjanovich invested additional money in the TEK Investment Program after he began receiving the email updates, which always spoke positively of the investment program and indicated that large returns would be forthcoming. [119]

97.     Danjanovich and Alder met Litster at a park where Litster was attending a softball game in early 2002 during which Litster acknowledged Danjanovich by name and told Alder and Danjanovich that the TEK Investment Program was going well but that funds were still not yet available.[120]

98.     Danjanovich first requested return or repayment of his investment in June 2002.[121] He first made the request to Alder who indicated that it would be no problem to get Danjanovich's money back in about 14 business days.[122] Danjanovich never received the money.[123]

99.     Thereafter, Danjanovich telephoned C. Cox about ten to fifteen times over a two to three-month period to request return or repayment of his investment.[124] C. Cox never told Danjanovich that he would need to seek recovery of his investment from Alder, never disputed that Danjanovich was an investor of TEK, and never disputed that Danjanovich invested $197,000 in

---

[119] Trial Exhibit 16; Trial Tr. at 23:23-24.

[120] Trial Tr. at 90:7-22.

[121] Trial Tr. at 90:23-25; 91:1-3.

[122] Trial Tr. at 91:4-7.

[123] Trial Tr. at 91:8-9.

[124] Trial Tr. at 369:18-25.

TEK.[125]  C. Cox told Danjanovich that he would ensure that Danjanovich's money was returned to him.[126]

100.    Danjanovich also contacted Doug Litster on multiple occasions by telephone and email seeking a return of his investment.  Litster declined to take Danjanovich's calls and did not respond to his emails.  Litster never told Danjanovich that he was not an investor in TEK, that TEK did not receive his $197,000 investment, or that Danjanovich would have to get his money from Alder.[127]

101.    Alder was in close communication with Litster about Danjanovich's investment.  On one occasion, Danjanovich spoke to Litster's daughter and left her with a message to have Litster call Danjanovich.  Within a few minutes, Alder called Danjanovich and told him that Litster did not want Danjanovich going to his residence.[128]

102.    In the summer of 2003, Danjanovich met with Robbins in the living room of Robbins' home in Fillmore, Utah to request return or repayment of his investment.[129]  This was the first time

---

[125] Trial Tr. at 91:11-25; 92:1-25.

[126] Trial Tr. at 131:5-11.

[127] Trial Tr. at 93 - 95; Trial Tr. at 423:14-25.

[128] Trial Tr. at 150:18 - 151:10.

[129] Trial Tr. at 95:20-25; 96:1-25.

Danjanovich had met Robbins. Robbins indicated that he would return Danjanovich's money to him from new investments TEK anticipated in a European water company.[130]

103.   Litster has spent time in recent years trying to raise money to return to the TEK investors.[131]  Litster acknowledges TEK "want[s] everyone to have their funds back" and that he has been trying to raise money to return to Danjanovich, inasmuch as Danjanovich "is part of Alder."[132]

104.   At least one disbursement from the TEK Investment Program was made to Alder in 2003 after Litster and C. Cox knew that Danjanovich was part of Alder's investment and had committed to Danjanovich that he would get his money back.[133]

105.   Danjanovich has not received any payment on the $197,000 investment that he made in TEK.[134]

106.   The Defendants Litster and C. Cox acted recklessly and intentionally.  They affirmatively misled investors because they knew or should have known that statements about promised returns, TEK's assets, and the performance of the TEK Investment Program were not true.

---

[130] Trial Tr. at 96:19-25.

[131] Trial Tr. at 440:16-19.

[132] Trial Tr. at 440:20-22.

[133] Trial Tr. at 446:13-25; 447:1-15.

[134] Pretrial Order, Stipulated Fact No. 17.

## The Anasazi Foundation Investment in TEK

107.    Asa Nielson ("Nielson") is the chairman of the Board of Directors of a 501(c)(3) organization called the Anasazi Cultural Research Foundation (the "Anasazi Foundation").[135]  He testified at trial as a witness for Danjanovich.

108.    The Anasazi Foundation sought to raise funds to build a cultural center near Ivins, Utah.  Nielson's friend John Cooper told Nielson that he knew someone who might be able to help the Anasazi Foundation.[136] In March 2002, John Cooper introduced Nielson to Robbins.  Nielson was told at that time that Robbins might be able to help the Anasazi Foundation but that he would be back in touch when he had some business deals squared away.[137]

109.    In late August or early September 2002, Nielson was introduced to Litster at a meeting at TEK's offices on Fort Union Boulevard in Salt Lake City, Utah.[138]  Nielson was told that Litster was a director of TEK Foundation and was also introduced to other TEK management at that meeting, including C. Cox, Hamel, and Bybee.[139]  Litster primarily told Nielson about TEK Foundation and TEK Corporation and their "prime bank instruments or bonds" investment

---

[135] Trial Tr. at 154:22-25

[136] Trial Tr. at 156:1-13.

[137] Trial Tr. at 157:4-5.

[138] Trial Tr. at 158:15-25.

[139] Trial Tr. at 159:1-8.

program.[140]  Litster told Nielson that if the Anasazi Foundation wished to invest, it could do so through I-Trust.[141]  Litster also represented to Nielson that investments made would receive 100% return per month.[142]

110.    In the weeks after that initial meeting, Anasazi Foundation invested in TEK, ultimately investing a total of about $1.19 million.[143]

111.    Like Danjanovich, Nielson received daily trading statements.  Those daily trading statements that Nielson received came directly from Litster and promised high profit returns on investments made.[144]

112.    The statements look nearly identical to the ones received by Danjanovich.[145]

113.    Litster also promised and represented to the Anasazi Foundation numerous times that its money and the promised returns were forthcoming.  To date, the Anasazi Foundation has received only a small amount in earnings and no return of the principal amount invested in TEK.[146]

---

[140] Trial Tr. at 160:1-25.

[141] Trial Tr. at 161:9-17.

[142] Trial Tr. at 162:13-19.

[143] Trial Tr. at 162:11-12.

[144] Trial Tr. at 166:18-25; 167:1-25.

[145] Trial Exhibit 16.

[146] Trial Tr. at 169:22-25; 171:1-9; 174:19-25.

## Procedural History of This Action

114.    On July 6, 2004, Danjanovich commenced this action against Defendants TEK Corporation, TEK Foundation, Bybee, Hamel, Nelson, Robbins, Alder, C. Cox, R. Cox, and Litster.

115.    C. Cox, R. Cox, and Litster are the only remaining Defendants, as others have been dismissed or, in the case of Robbins, Alder, TEK Corporation, and TEK Foundation, had judgment entered against them.

116.    Danjanovich has asserted the following seven claims against the remaining Defendants in this action:

      (i)      Violation of Section 12(1) of the Securities Act of 1933;
      (ii)     Violation of Section 10(b) of the Securities and Exchange Act of 1934 and of Rule 10b-5;
      (iii)    Violation of the Unregistered Broker-Dealer Provisions of the Utah Securities Act;
      (iv)    Misrepresentations in Violation of the Utah Securities Act;
      (v)     Fraud;
      (vi)    Breach of Contract; and
      (vii)   Punitive Damages.

117.    The remaining Defendants admit most of the operative facts for these causes of action in either their answer to the first amended complaint, answers to discovery (including requests for admission), depositions, and affidavits.

118.    The remaining Defendants did not timely or fully respond to Danjanovich's discovery requests in this action.

119.    As of the date of the trial, Danjanovich had incurred $163,692 in attorney fees and costs in this action.  Danjanovich had been billed for $72,702 of that total amount.[147]

120.    Interest earned on a variety of legitimate, reputable bond investments ranged from 12% to 50% during the period in which Danjanovich participated in the TEK Investment Program.[148]

## CONCLUSIONS OF LAW

A.    The Defendants organized and implemented a scheme to raise millions of dollars from investors, promising them rates of return that would double their investment every month.  The Defendants used a corporation called "TEK Corporation" and an entity named "TEK Foundation" (sometimes referred to collectively as "TEK") as a vehicle to implement this fraudulent scheme. Robbins, Litster, and C. Cox primarily controlled TEK Corporation.  The Defendants used Alder to solicit investments in the scheme.

B.    The Defendants, including Litster and C. Cox, represented to potential investors that TEK Foundation was a charitable organization that was advancing education around the world, primarily in Third World countries.  TEK Corporation was raising funds for TEK Foundation.  The remaining Defendants represented to investors that because TEK Foundation was a charitable organization, the United States Government had given it and/or TEK Corporation access to

---

[147] Trial Tr. at 111:4-16; Trial Exhibit No. 76.

[148] Trial Tr. at 111:22-25; 112:1-6.

confidential stock trading information that would allow it to make many millions of dollars, which money would be used to advance the TEK entities' charitable purposes and, at the same time, provide investors with incredible returns. None of this was true.

C.    Rather, the Defendants were involved in something like a classic Ponzi scheme designed to raise large amounts of money for their own personal benefit.

D.    The facts presented at trial establish that Defendants C. Cox and Litster personally made misrepresentations about TEK, its assets, and the TEK Investment Program to Danjanovich to solicit his participation in that program, that they controlled TEK Corporation, that they controlled I-Trust into which funds were deposited, that they sold securities without a license, that the securities were not registered, and that they benefited personally from Danjanovich's investment.

**The Individual Defendants are Liable as "Control Persons" of the TEK Entities**

E.    On May 16, 2006, the Court entered judgment in this action against TEK Corporation and TEK Foundation (Docket Nos. 223, 224). TEK Corporation and TEK Foundation have, therefore, been found liable to Danjanovich on his two federal securities law causes of action.

F.    Sections 77o and 78t of title 15 of the United States Code provide that persons in control of a seller or offeror of securities are jointly and severally liable for the seller or offeror's securities laws violations.[149]

---

[149] *See* 15 U.S.C. §§ 77o, 78t (2000).

G.     Section 77o provides as follows:

Every person who . . . controls any person liable under sections 77k or 77l of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.[150]

H.     Likewise, Section 78t provides as follows:

Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.[151]

I.     Similarly, the Utah Securities Act provides that

Every person who directly or indirectly controls a seller or buyer liable under Subsection (1), every partner, officer, or director of such a seller or buyer, … are also liable jointly and severally with and to the same extent as the seller or purchaser, unless the nonseller or nonpurchaser who is so liable sustains the burden of proof that he did not know, and in exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist.[152]

---

[150] 15 U.S.C. § 77o (2000).

[151] 15 U.S.C. § 78t (2000).

[152] Utah Code § 61-1-22(4) (2005).

31

J.       Under Tenth Circuit case law, to state a prima facie case of control person liability under either Section 77o or 78t, "the plaintiff must establish (1) a primary violation of the securities laws and (2) 'control' over the primary violator by the alleged controlling person."[153]  The Tenth Circuit "has expressly 'rejected those decisions that may be read to require a plaintiff to show the defendant actually or culpably participated in the primary violation.'"[154]  "Rather, once the plaintiff establishes the prima facie case, the burden shifts to the defendants to show lack of culpable participation or knowledge."[155]

K.       Danjanovich alleged in his First Amended Complaint that "[t]he Individual Defendants [a defined term that includes C. Cox, R. Cox, and Litster] possessed, directly or indirectly, the power to direct or cause the direction of the management and policies of TEK Foundation and TEK Corporation."[156]

L.       C. Cox, R. Cox, and Litster admitted this allegation.[157]  Moreover, the Court entered an order finding that C. Cox, R. Cox, and Litster possessed, directly or indirectly, the power to direct or cause the direction of the management and policies of TEK Foundation and TEK Corporation.[158]

---

[153] *Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1305, 1305 n.7 (10th Cir. 1999) (noting that the control person provisions of 15 U.S.C. § 77o and 15 U.S.C. § 78t are interpreted the same).

[154] *Id.*

[155] *Id*

[156] First Amended Complaint at ¶ 54 (Docket No. 64).

[157] *See* Answer of Defendants Douglas Litster, Clair Cox, Roger Cox, TEK Corporation, and TEK Foundation to First Amended Complaint at ¶ 54 (Docket No. 83).

M.    Even if C. Cox and Litster had not admitted the allegation, Danjanovich met his burden to prove that C. Cox and Litster exercised requisite "control" over the TEK entities.  They helped form TEK Corporation and TEK Foundation and held management positions in the TEK entities.  They were involved in the TEK entities' daily business affairs and familiar with their financial dealings.  They had direct contact with TEK investors, either through in-person meetings at the TEK Corporation offices or by telephone.  Litster also had direct contact in sending out daily emails to TEK investors.  C. Cox had check-signing authority for TEK Corporation.  Although C. Cox and Litster denied knowing all of the details of all of the transactions and investments in which the TEK entities were involved and suggested that they, at times, were essentially automatons carrying out directives from Robbins, they failed to meet their burden to show lack of culpable participation or knowledge.

N.    Danjanovich offered no evidence to show that R. Cox exercised requisite "control" over the TEK entities.   R. Cox satisfied his burden to show lack of culpable participation or knowledge.  Although he admitted supplying a biography and picture for posting to the "leadership" section of the TEK website, he had no involvement in the daily business affairs of the TEK entities.

---

[158] Memorandum Decision Granting in Parting Plaintiff's Motion in Limine Regarding Admitted Matters May 22, 2006 at 4 (Docket No. 211).

**First Cause of Action—Violation of 15 U.S.C. § 77e**
**(Section 12(1) of the Securities Act of 1933)**

O.     In his First Cause of Action, Danjanovich seeks imposition of liability against C. Cox, R. Cox, and Litster for selling securities without a registration statement.  Section 77e provides as follows:

> Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly—(1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale.[159]

P.     To prevail on his claim under 15 U.S.C. § 77e, Danjanovich must prove the following:

> (1)     defendants, or a person or entity they controlled, offered to sell or sold a security to plaintiff;
>
> (2)     the security was not registered; and
>
> (3)     defendants, or a person or entity they controlled, utilized the mails or some instrument of interstate commerce in connection with the sale.[160]

Q.     "[O]nce the plaintiff establishes the prima facie case, the burden shifts to the defendant to show lack of culpable participation or knowledge."[161]  Importantly, scienter is not an element of a violation here.[162]

---

[159] 15 U.S.C. Section 77e.

[160] *See SEC v. International Chemical Dev. Co.*, 469 F.2d 20, 27 (10th Cir. 1972).

R.     As to the first element, the Defendants do not dispute that the TEK Investment Program involved the sale of securities.[163] The Securities Act of 1933 defines the term "security" as including an "investment contract."[164]  The Supreme Court has defined an "investment contract" to mean: (i) an investment of money, (ii) in a common enterprise, (iii) with a reasonable expectation of profits to be derived solely from the efforts of the promoter or a third party."[165]  It is "immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests in the physical assets employed in the enterprise."[166]

S.     The TEK Investment Program involved the investment of money for the raising of funds for TEK Foundation and its purported charitable purposes.  The TEK Investment Program promised substantial profits and returns to investors through Robbins' and the TEK entities' efforts in investing the money received from investors.   These same promises and representations about the TEK Investment Program were made to Danjanovich by Alder and not subsequently disavowed by C. Cox and Litster in meetings at the TEK Corporation offices.  Also, in a meeting between Kent

---

[161] *Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1305 (10th Cir. 1999).

[162] *See Aaron v. Securities and Exchange Comm'n*, 446 U.S. 680, 714 n.5 (J. Blackmun, dissenting) ("The prohibition in § 5 of the 1933 Act, 15 U.S.C. § 77e, against selling securities without an effective registration statement has been interpreted to require no showing of scienter.").

[163] *See* Defendants' Trial Memorandum.

[164] 15 U.S.C. § 77b(1).

[165] *S.E.C. v. W. J. Howey Co.*, 328 U.S. 293, 298-99 (1946).

[166] *Id.*

Danjanovich, Scott Alder, Doug Litster and Clair Cox prior to the investment by Danjanovich, Litster or C. Cox personally represented that the Danjanovichs could make more money than they ever imagined in the investment program.

T.      As to the second element, the Defendants admit that no registration statement was filed for the TEK Investment Program or any investment made in conjunction with such program.[167]

U.      As to the third element, the Defendants individually and through the TEK entities used instruments of interstate commerce—email correspondence and the Internet—in connection with the sale of securities.  C. Cox and Litster solicited investors in the TEK Investment Program by inviting them to visit the TEK website.  The TEK website included material and information about TEK, its assets, its management, and its mission that C. Cox and Litster knew or should have known would be relied on by investors.  They personally solicited Danjanovich's participation in the TEK Investment Program when they invited him to visit the TEK website and told him about the TEK Investment Program and how it worked and what returns it would generate for investors at one or more meetings at the TEK Corporation offices.

V.      Litster also corresponded by email with investors—almost on a daily basis during much of 2002—about their investments, the anticipated return on investments, and the TEK Investment Program.  Although Litster denies that he sent emails to Danjanovich directly, even if that were true, Litster became aware that Alder was forwarding the emails to others, including

---

[167] Pretrial Order, Stipulated Fact No. 2.

Danjanovich. Litster did not take steps to prevent the emails from being forwarded, and such emails do not say on their face that they should not be or are not to be forwarded.

W.     Danjanovich gave Alder $90,000. Alder in turn, deposited some, if not all, of that amount in I-Trust or other TEK accounts.

X.     Alder told Litster that he was soliciting investors for the TEK Investment Program and that he had funds from others that he was placing in I-Trust. Litster acknowledged that he knew Alder was depositing money from others into I-Trust. Although the information Alder provided Litster by email correspondence does not identify investors by name, based on the amounts and dates listed, it appears that Danjanovich was among those investors.

Y.     Litster failed to offer credible evidence to contradict the testimony of Danjanovich. C. Cox invoked the Fifth Amendment as to almost every question about the TEK Investment Program. Because Danjanovich demonstrated a threshold connection between C. Cox and the TEK Investment Program, the Court is permitted to draw an adverse inference against C. Cox on whether amounts Danjanovich placed with Alder found their way to TEK. In addition, neither TEK nor any of its principals, including C. Cox and Litster, was forthcoming in complying with Danjanovich's discovery requests for information and documents about the TEK Investment Program or furnishing a copy of its list of investors.

Z.     Danjanovich also deposited $55,500 directly into I-Trust, an account associated with TEK and controlled by TEK principals.

37

AA.    As to both the amount deposited with Alder and the amount deposited directly to I-Trust, Danjanovich satisfied his burden of making a prima facie case for a violation of Section 77e.

BB.    R. Cox met his burden to show lack of culpable participation and knowledge. Litster and C. Cox, however, failed to meet that burden. They knew that Alder was soliciting participants or had obtained money from others for use in the TEK Investment Program. They knew of Danjanovich's involvement both directly through I-Trust and indirectly through Alder. They invited Danjanovich's participation when they told him about the TEK website and suggested that he could learn more about the TEK Investment Program there. They also represented that returns in amounts that were greater than the Danjanovichs could imagine could be made in the investment program. C. Cox and Litster are also liable as control persons of TEK.

CC.    C. Cox and Litster violated 15 U.S.C. § 77 with respect to the investment Danjanovich made in the TEK Investment Program. Danjanovich is, therefore, entitled to recover from C. Cox and Litster jointly and severally the full amount of the investment he made in the TEK Investment Program in the amount of $197,000, plus interest and attorney's fees.[168]

DD.    As the Securities Act of 1933 does not provide a specific rate, interest is generally determined on a case-by-case basis in accordance with equitable considerations.[169]

---

[168] *See* 15 U.S.C. §§ 77l(a)(2)(b), 77k(e).

[169] *See, e.g., Johns Hopkins Univ. Hutton*, 297 F. Supp. 1165, 1228 (D. Md. 1968) (interest imposed "should compensate fairly the defrauded purchaser for the loss of the use of his money"), *aff'd in part, rev'd in part on other grounds*, 422 F.2d 1124 (4th Cir. 1970), *cert. denied*, 416 U.S. 916 (1974); *Western Fed. Corp. v. Davis*, 533 F. Supp. 818, 821 (D. Ariz. 1982), *aff'd* 739 F.2d 1439 (9th Cir. 1984).

EE.    Danjanovich maintains that the interest rate should at least 25% per annum, which is far less than the 100% rate he was promised and a reasonable rate of return that he could have earned on a number of legitimate investments. The Defendants did not offer any evidence as to the applicable interest rate or contradict Danjanovich's evidence on the requested 25% interest rate. Accordingly, interest will be awarded at the rate of 25%.

FF.    As of the date of the trial, Danjanovich had incurred $169,494 in attorney's fees and costs in this action. Danjanovich had been billed for $72,702 of that total amount.[170] Danjanovich is awarded attorney's fees and costs in the amount of $72,702.

## Second Cause of Action—Violation of 15 U.S.C. § 78j(b) (Section 10(b) of the Securities Exchange Act of 1934) and 17 C.F.R. § 240.10b-5

GG.    In his Second Cause of Action, Danjanovich seeks imposition of liability against C. Cox, R. Cox, and Litster for securities fraud under Section 10(b) of the Exchange Act of 1934 which provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—…
> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement (as defined in section 206B of the Gramm-Leach-Bliley Act), any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of

---

[170] Trial Tr. at 111:4-16.

investors.[171]

HH.    Rule 10b-5 promulgated under applicable provisions of the Exchange Act provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.[172]

II.    To prevail on a claim under Section 10(b) of the Securities Exchange Act and Rule 10b-5 promulgated thereunder, Danjanovich must prove (1) a misrepresentation or omission, (2) of a material fact, (3) made with scienter, (4) that the plaintiff relied upon, and (5) which caused plaintiff's injury.[173]   Fraudulent intent is an element of a Section 10(b) offense.[174]   It need not be

---

[171] 15 U.S.C. § 78j(b) (2000).

[172] 17 C.F.R. § 240.10b-5 (2000).

[173] *See* 5 U.S.C. § 78j(b) 2000; 17 C.F.R. § 240.10b-5 2000; *Basic Inc. v. Levinson*, 485 U.S. 224, 230-31 (1988).

[174] *See U.S. v. MacKay*, 491 F.2d 616, 619 (10th Cir. 1973).

proven directly, but may be inferred from the facts and circumstances surrounding a defendant's actions.[175]

JJ.     In this case, the individual defendants either knew or should have known that investors would rely on statements promising 100% return per month, as well as the representations contained on TEK's website.

KK.    Under the first element, misrepresentations include: that TEK would pay to Danjanovich a return of 100% per month; that TEK Corporation had access to confidential governmental information that would allow it to generate these large profits with little or no investment risk; and that TEK had numerous and substantial real estate assets. The statements regarding the anticipated returns were false. The representations on the website about TEK's real estate assets were false.

LL.     Under the second element, these misrepresentations were material. They related to basic information about TEK—its management, its assets, and its business plan and purpose—and were the kind of facts that potential investors would want to know when contemplating an investment.

MM.   Under the third element, these material misrepresentations were made intentionally and knowingly. TEK and its principals knew that 100% per month returns were all but impossible,

---

[175] *See U.S. v. Prows*, 118 F.3d 686, 692 (10th Cir. 1997).

that there was no confidential information assets arrangement with the United States Government, and that TEK did not have millions of dollars worth of property assets.

NN.    Under the fourth element, Danjanovich was directed to the TEK website before he invested in the TEK Investment Program. He visited the website and reviewed the information about TEK assets and the management biographies posted there. The credentials of C. Cox, Litster, and Robbins impressed Danjanovich. He relied on the information on the TEK website when he invested in TEK. He testified that he would not have invested if he would have known, for example, of Robbins' prior criminal record or that statements about TEK and its assets were untrue. The Danjanovichs were also told in a meeting with Kent Danjanovich and C. Cox and Litster that the Danjanovichs could make more money in the TEK Investment Program than they could imagine. Danjanovich relied on this statement in investing.

OO.    Under the fifth element, Danjanovich lost the investment of $197,000 he made in the TEK Investment Program and has not received any returns or profits on such amount.

PP.    The Defendants' only defense to the cause of action for securities fraud is that Danjanovich is Alder's investor, not TEK's investor, and that they did not make representations to Danjanovich directly. However, securities case law provides that the individual defendants may be liable to Danjanovich even if the Court finds that they did not personally make representations to Danjanovich.

QQ.    As this Court has recently explained, "[t]he Tenth Circuit has expressly held that 'there is no requirement that the alleged violator directly communicate misrepresentations to

42

investors.  It is enough that a person knew or should have known that his representation would be communicated to investors.'"[176] All that is required is that the Defendants either knew or should have known that false representations would be communicated to investors.[177]

RR.    C. Cox and Litster are liable as control persons of TEK Corporation and under this applicable case law, because of the representations TEK made through its website and through Alder and because Danjanovich deposited sums directly with TEK.[178]  C. Cox and Litster also overlook that they made some representations to Danjanovich directly about the TEK website and the returns they could make in the Investment Program.

SS.    C. Cox and Litster violated Section 10(b) with respect to the investment Danjanovich made in the TEK Investment Program.  Danjanovich is, therefore, entitled to recover from C. Cox and Litster jointly and severally the full amount of the investment he made in the TEK Investment Program in the amount of $197,000.[179]

TT.    The award of prejudgment interest is within the discretion of the trial court and is awarded when the trial court determines it is necessary to compensate the injured party.[180]  As

---

[176] *SEC v. Autocorp Equities, Inc.*, 292 F. Supp. 2d 1310, 1319 (D. Utah 2003) (quoting *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215, 1226 (10th Cir. 1996)).

[177] *See Anixter*, 77 F.3d at 1226.

[178] R. Cox is liable as a control person as well, but as discussed in previous causes of action, he successfully satisfied his burden to show lack of culpable participation and knowledge.

[179] *See* 15 U.S.C. § 78bb(a) (stating that a plaintiff is entitled to recover "actual damages" on a 10(b) claim).

[180] *See U.S. Indus., Inc. v. Touche Ross & Co.*, 854 F.2d 1223, 1254-57 and n. 43 (10th Cir. 1988), *implied overruling on other grounds recognized by Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215, 1231 (10th Cir. 1996).

discussed in the previous cause of action, the Defendants did not offer any evidence about the applicable interest rate or to contradict Danjanovich's evidence on the requested 25% interest rate. Accordingly, interest will be awarded at the rate of 25%.

### Third and Fourth Causes of Action—Unregistered Broker-Dealer and Misrepresentations Under Utah Securities Act

UU.     Danjanovich has also asserted state law causes of action for (i) "unregistered broker-dealer" and (ii) "making misrepresentations" under the Utah Securities Act.[181]  Under Section 61-1-13 of the Utah Code, it is unlawful for any person to transact business in the State of Utah as a broker-dealer unless the person is licensed to do so.[182]  Section 61-1-1 of the Utah Code provides that it is

> unlawful for any person, in connection with the offer, sale, or purchase of a security, directly or indirectly, to:
>
> (1)  employ any scheme or artifice to defraud;
>
> (2)  make any untrue statement of a material fact . . . ; or
>
> (3) engage in any act, practice, or course of business which operates as a fraud and deceit upon any person.[183]

---

[181] *See* Utah Code §§ 61-1-3(1), 61-1-1 (2005).

[182] *See* Utah Code § 61-1-3(1) (2005).

[183] Utah Code § 61-1-1 (2005).

44

VV.    The term "security" means, among others, any note, stock, treasury stock, bond, debenture, evidence of indebtedness, investment contract, etc.[184]  The term "broker-dealer" means "any person engaged in the business of effecting transactions in securities for the account of others or for the person's own account" but does not include, among others, "an agent," "an issuer," "a person whose participation in transactions in securities is confined to those transactions made by or through a broker-dealer licensed in this state."[185]

WW.    Each of the elements of these two state law securities claims has been proven as part of the federal securities law claims.  Neither TEK nor any of its principals, including C. Cox and Litster, was a licensed broker-dealer in Utah at the time Danjanovich participated in the TEK Investment Program.[186] The TEK Investment Program was a fraudulent scheme in which substantial sums were taken from investors, including Danjanovich, on promises of sizable returns.   TEK, through C. Cox and Litster, through its website, and through Alder, made material misrepresentations about the TEK Investment Program, anticipated returns to investors, and TEK's assets. Danjanovich, like other investors, never received his principal investment back, let alone the promised 100% monthly returns.

XX.    There exists an exception to liability under Section 61-1-1(2):  "A person who offers or sells a security in violation of Subsection 61-1-1(2) is not liable under Subsection (1)(a) if the

---

[184] Utah Code § 61-1-13(x) (2005).

[185] Utah Code § 61-1-13(c) (2005).

purchaser knew of the untruth or omission, or the seller did not know and in the exercise of reasonable care could not have known of the untrue statement or misleading omission."[187]  The remaining Defendants failed to show that Danjanovich knew of the untruth of the representations made about TEK, its website, and the TEK Investment Program.  Moreover, the Defendants failed to show what reasonable steps, if any, Danjanovich could have taken to discover the untruth of such representations.  To the contrary, the Defendants gave Danjanovich every indication that the TEK Investment Program was performing as they had represented, when they, for example, spoke of making more money than one could ever imagine or made clear that they had the requisite financial backing to support a sizable investment in the Saratoga Springs Golf Course project.

YY.    Danjanovich has proven that TEK violated Utah securities law.  Like federal securities law, the Utah Securities Act imposes joint and several liability for control persons as well.[188]  C. Cox and Litster are, therefore, liable for such Utah securities law violations as control persons of TEK.[189]

---

[186] *See* Defendants' Answer at ¶ 86; TEK Foundation Requests for Admission, at Admission Request No. 19.

[187] Utah Code § 61-1-22(3) (2005).

[188] "Every person who directly or indirectly controls a seller or buyer liable under Subsection (1), every partner, officer, or director of such a seller or buyer, … are also liable jointly and severally with and to the same extent as the seller or purchaser, unless the nonseller or nonpurchaser who is so liable sustains the burden of proof that he did not know, and in exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist."  Utah Code § 61-1-22(4) (2005).

[189] R. Cox is liable as a control person as well, but Danjanovich concedes that R. Cox satisfied his burden to show that he did not know, nor could he have reasonably known, of the facts on which liability of TEK and its control persons is based.

ZZ.    Under Utah securities law, Danjanovich is entitled to recovery of the consideration paid, interest at 12%, reasonable attorney's fees, and costs.[190]  Further, Utah Code Ann. § 61-1-22(2) allows the Court to award an amount equal to three times the consideration paid for the securities upon a showing that the violation was reckless or intentional.  The Court concludes that the Defendants acted recklessly and intentionally.  They affirmatively misled investors because they knew statements about promised returns, TEK's assets, and the performance of the TEK Investment Program were not true.  Danjanovich is, therefore, awarded $197,000 trebled—amounting to $591,000—plus 12% annual interest from June 2002, the month in which Danjanovich first requested return of his investment.

### Fifth Cause of Action—Common Law Fraud

AAA.  Danjanovich has also asserted a claim for common law fraud.  To succeed on a common law fraud claim, the movant must establish by clear and convincing evidence (1) a representation, (2) concerning a presently existing material fact, (3) which was false, (4) which the representer either (a) knew to be false or (b) made recklessly, knowing that he had insufficient knowledge on which to base such representation, (5) for the purpose or inducing the other party to

---

[190] "A person who offers or sells a security in violation of Subsection 61-1-3(1) … is liable to the person selling the security to or buying the security from him, who may sue either at law or in equity to recover the consideration paid for the security, together with interest at 12% per year from the date of payment, costs, and reasonable attorney's fees, less the amount of any income received on the security, upon the tender of the security or for damages if he no longer owns the security."  Utah Code § 61-1-22(1)(a).  "Damages are the amount that would be recoverable upon a tender less the value of the security when the buyer disposed of it and interest at 12% per year from the date of disposition."  Utah Code § 61-1-22(1)(b).

act upon it, (6) that the other party, acting reasonably and in ignorance of its falsity, (7) did in fact rely upon it, (8) and was thereby induced to act, (9) to his injury and damage.[191]

BBB.    Danjanovich has proven the elements of common law fraud in connection with the state and federal securities law claims.    Representations made to Danjanovich, either through Alder or through C. Cox or Litster, or through the TEK website, concerned material facts about TEK, its assets, and the TEK Investment Program which were false.    C. Cox and Litster either knew these representations were false or made these representations recklessly.    These representations were made to induce Danjanovich to invest his money, and Danjanovich did so relying on these statements.    Danjanovich was injured by so relying on C. Cox's and Litster's statements; he invested $197,000 in the TEK Investment Program and, to date, has not received any portion of that investment back.    The Court concludes that Danjanovich presented sufficient evidence to meet the clear and convincing standard required and that C. Cox and Litster are liable to Danjanovich on his common law fraud claim.

### Sixth Cause of Action—Breach of Contract

CCC.    Danjanovich also asserts a cause of action against the remaining Defendants for breach of contract.    Under Utah law, the "elements of a prima facie case for breach of contract are (1) a

---

[191] *Secor v. Knight*, 716 P.2d 790, 794 (Utah 1986) (citations omitted).

contract, (2) performance by the party seeking recovery, (3) breach of the contract by the other party, and (4) damages."[192]

DDD. With regard to breach of contract, Danjanovich maintains that his investment is, by its nature, a contract as well as a security. Indeed, the Securities Act of 1933 defines the term "security" as including an "investment contract."[193] The Supreme Court has defined an "investment contract" to mean: "(i) an investment of money, (ii) in a common enterprise, (iii) with a reasonable expectation of profits to be derived solely from the efforts of the promoter or a third party."[194]

EEE. Danjanovich's investment is both a security and a contract, and the remaining Defendants' failure to pay as promised constitutes breach of contract. Danjanovich performed under the contract. He invested $90,000 with Alder and additional amounts totaling $107,000 with TEK directly. TEK and the remaining Defendants failed to perform under the contract. The remaining Defendants have not repaid, or attempted to repay, any of the amount Danjanovich invested or the 100% monthly interest rate promised to him. Danjanovich has suffered damages in the form of lost amounts invested and lost returns promised.

---

[192] *Bair v. Axiom Design, L.L.C.*, 20 P.3d 388, 391 (Utah 2001) (*citing Nuttall v. Berntson*, 30 P.2d 738, 741 (Utah 1934)).

[193] 15 U.S.C. § 77b(1).

[194] *S.E.C. v. W. J. Howey Co.*, 328 U.S. 293, 298-99 (1946).

### Seventh Cause of Action—Request for Punitive Damages

FFF.    Finally, Danjanovich requests that the Court assess punitive damages against the remaining Defendants.  Punitive damages "punish conduct which manifests a knowing or reckless indifference toward, and disregard of, the rights of others."[195]  Under Utah law, "punitive damages are available only upon clear and convincing proof of 'willful and malicious or intentionally fraudulent conduct, or conduct that manifests a knowing and reckless indifference toward, and disregard of, the rights of others.'"[196]

GGG.    Danjanovich submits that by definition, actions taken to defraud investors from hundreds of thousands of dollars constitute a "reckless indifference toward" and "disregard of the rights of others."  Moreover, Danjanovich established facts showing intentional fraudulent conduct in violation of federal securities law.  Punitive damages are designed to address this type of conduct and are hereby awarded to Danjanovich.

HHH. The Court determines that an award of _____ in punitive damages is appropriate in this case.

### RELATED MATTERS

III.    The Court addresses two other issues related to the disposition of this action.

---

[195] *Synergetics v. Marathon Ranching Co., Ltd.*, 701 P.2d 1106, 1112-1113 (Utah 1985).

[196] *Russell v. Lundberg*, 120 P.3d 541, 547 (Utah Ct. App. 2005) (quoting *Smith v. Fairfax Realty, Inc.*, 82 P.3d 1064 (citing Utah Code Ann. § 78-18-1(1)(a) (2002))).

JJJ.    First, C. Cox invoked the Fifth Amendment throughout his deposition in responding to questions about almost all aspects of the TEK Investment Program and its investors and associations between Alder and TEK.[197]  Before trial, Danjanovich filed a motion asking the Court to preclude C. Cox from testifying at trial on those matters for which he invoked the Fifth Amendment during his deposition and to draw an adverse inference against C. Cox as to these same matters.  On May 15, 2006, the Court granted Danjanovich's motion in part (Docket No. 219), precluding C. Cox from testifying at trial concerning matters for which he invoked the Fifth Amendment during discovery and leaving for determination at trial whether the Court would impose an adverse inference against C. Cox as to these same matters.  The Court indicated that "[i]f Plaintiff can present evidence which connects Defendant Cox to his claim for relief, then the Court may impose an adverse inference."[198]  At trial, Danjanovich satisfied the threshold requirement to connect C. Cox to Danjanovich's requested claims for relief for federal and state securities law violations.  Danjanovich demonstrated that C. Cox was a control person of TEK, that he was involved in and familiar with TEK's daily business affairs, and that he had a working knowledge of TEK's financial dealings and the TEK Investment Program.  The Court, therefore, imposes an adverse inference against C. Cox.

---

[197] Trial Tr. at 237:17-25; 238l 239; 240; 241; 242:1-5; 251:13-19; 258:7-10.

[198] Memorandum Decision dated May 15, 2006, at 6 (Docket No. 219).

KKK.  Second, at trial, Danjanovich's counsel moved to strike Bybee's testimony and the related web pages exhibit to which he testified on grounds that such were not identified or produced by TEK or the remaining Defendants in discovery.  The Court indicated at that time that it would take Danjanovich's request under advisement.  The remaining Defendants were on notice that Danjanovich intended to present evidence about the TEK website, its contents, and when and what Danjanovich viewed on that website before he invested in the TEK Investment Program.  Yet, TEK and the remaining Defendants were not forthcoming in producing documents or information responsive to Danjanovich's discovery requests.  The Court, therefore, grants Danjanovich's motion to strike Bybee's testimony.

## CONCLUSION

It is therefore

ORDERED that with respect to the First Cause of Action for selling securities without a registration statement under federal securities law, C. Cox and Litster are jointly and severally liable to Danjanovich for $197,000, the amount of his investment in the TEK Investment Program, plus prejudgment interest at the rate of 25% and attorney's fees and costs in the amount of $72,702.

ORDERED that with respect to the Second Cause of Action for Section 10(b) violations under federal securities law, C. Cox and Litster are jointly and severally liable to Danjanovich for $197,000, the amount of his investment in the TEK Investment Program, plus prejudgment interest at the rate of 25%.

ORDERED that with respect to the Third and Fourth Causes of Action for unregistered broker-dealer and misrepresentations under the Utah Securities Act, C. Cox and Litster are jointly and severally liable to Dajanovich for $591,000, plus 12% annual interest from June 2002, the month in which Danjanovich first requested return of his investment, plus attorney's fees and costs in the amount of $72,702.

ORDERED that with respect to the Fifth Cause of Action for common law fraud, C. Cox and Litster are jointly and severally liable to Danjanovich for $197,000.

ORDERED that with respect to the Sixth Cause of Action for breach of contract, C. Cox and Litster are jointly and severally liable to Danjanovich for $197,000.

ORDERED that with respect to the Seventh Cause of Action for assessment of punitive damages, C. Cox and Litster are jointly and severally liable to Danjanovich for punitive damages in the amount of _____.

ORDERED that a form of judgment will be separately entered and will include an award of post-judgment interest at the applicable federal rate.

DATED this ____ day of _____, 2006.

THE COURT:


_____
The Honorable Ted Stewart
United States District Court Judge

53

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 21st day of July, 2006, a true and correct copy of the foregoing **PLAINTIFF RANDALL DANJANOVICH'S [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW** was served by United States first class mail, postage prepaid, on each of the following:

Scott Alder
P.O. Box 448
Washington, UT  84780

Thomas Robbins
220 East Center Street
Fillmore, UT  84631

Scott Alder
1210 West Lions Head Drive
Washington, UT  84780-8425

Richard Bybee
P.O. Box 711976
Salt Lake City, UT  84171-1976

Counsel for Clair Cox, Douglas L. Litster,
and Roger Cox, TEK Foundation, and TEK
Corporation
Delano Findlay
FINDLAW, LLC
684 East Vine Street, Suite 3
Murray, UT  84107
(By CM/ECF electronic noticing as well)

_____/s/ Adelaide Maudsley_____

54